**SUPREME COURT OF THE STATE OF NEW YORK**
*Appellate Division, Fourth Judicial Department*

**203**

**KA 06-00060**

PRESENT: SCUDDER, P.J., CENTRA, PERADOTTO, LINDLEY, AND MARTOCHE, JJ.

---

THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,

V                                                    MEMORANDUM AND ORDER

DOUGLAS E. LEE, DEFENDANT-APPELLANT.
(APPEAL NO. 1.)

---

THE ABBATOY LAW FIRM, PLLC, ROCHESTER (DAVID M. ABBATOY, JR. OF COUNSEL), FOR DEFENDANT-APPELLANT.

MICHAEL C. GREEN, DISTRICT ATTORNEY, ROCHESTER (NANCY GILLIGAN OF COUNSEL), FOR RESPONDENT.

---

Appeal from a judgment of the Monroe County Court (Alex R. Renzi, J.), rendered October 5, 2005. The judgment convicted defendant, upon his plea of guilty, of burglary in the second degree.

It is hereby ORDERED that the judgment so appealed from is reversed on the law, the plea is vacated, that part of the motion seeking to suppress statements made by defendant is granted, and the matter is remitted to Monroe County Court for further proceedings on the indictment.

Memorandum: In appeal No. 1, defendant appeals from a judgment convicting him, upon his plea of guilty, of burglary in the second degree (Penal Law § 140.25 [2]). In appeal No. 2, he appeals from a judgment convicting him, also upon his plea of guilty, of attempted burglary in the second degree in satisfaction of a separate indictment (§§ 110.00, 140.25 [2]).

The conviction in appeal No. 1 arises from defendant's theft of two bicycles in the Town of Irondequoit in the early morning hours of July 16, 2004. Defendant contends that County Court erred in refusing to suppress the statements that he made to the arresting officer because, inter alia, he was illegally detained in violation of his Fourth Amendment rights. We agree with defendant that his statements should have been suppressed on that ground. We note at the outset, however, that defendant's contention is confined solely to the judgment of conviction in appeal No. 1, and that he raises unrelated issues in appeal No. 2 that are unaffected by our determination in appeal No. 1.

With respect to appeal No. 1, at approximately 6:00 A.M. on the day in question, the Irondequoit Police Department received a report of a suspect who was "possibly" stealing bicycles. The report was

called in by a local Town Justice, who had found a bicycle in his
driveway.  In response to the report, a police officer drove to the
residence of the Town Justice, who stated that his newspaper delivery
woman had told him that she encountered a man riding one bicycle while
simultaneously pulling the second bicycle that the Town Justice
discovered was left in his driveway.  The delivery woman had described
the man to the Town Justice as a black male wearing a dark hooded
sweatshirt and jeans.

Upon receiving that information, the officer left the Town
Justice's residence in search of the suspect.  After driving
approximately one block, the officer observed defendant, a black male
wearing a dark hooded sweatshirt and greenish-colored jeans, emerge
from a nearby yard riding a bicycle.  Defendant proceeded to ride the
bicycle down the sidewalk, whereupon the officer pulled alongside him
and called out for him to stop.  Defendant initially did not comply,
but when the officer yelled a second time for him to stop, defendant
complied.  The officer then exited his vehicle and approached
defendant.  When asked at the suppression hearing what he initially
said to defendant, the officer responded, "I told him that we had a
report of a suspicious male possibly stealing bikes and that the
description of the male was a male black wearing a darker . . . hooded
sweatshirt and jeans, and as you can see you fit the description, so I
just have to make an inquiry and you'll be on your way if everything's
okay."  The officer testified similarly on cross-examination,
explaining that, upon stopping defendant and explaining the reason
therefor, the officer advised defendant that "after everything checks
[out], you'll be on your way."  The stop occurred at 6:21 A.M.

The officer proceeded to ask defendant a series of questions,
including his identity, where he lived and what he was doing in the
area.  Defendant answered the officer's questions.  When the officer
asked where he had gotten the bike, defendant said that he purchased
it a week earlier from "some dude" for $45.  At some point during the
questioning, another police officer arrived at the scene, and that
second officer remained on the sidewalk with defendant while the first
officer at the scene commenced an investigation.  The first officer
went to several residences on the street and questioned homeowners to
determine whether their homes or garages had been burglarized.  At
6.45 A.M., approximately 24 minutes after defendant was initially
stopped by the police, the newspaper delivery woman, acting on her own
volition, arrived at the scene and identified defendant as the person
she had observed earlier in the morning with two bicycles.  Fifteen
minutes later, a third officer arrived with a civilian who identified
the bicycle that defendant was riding as his.  Defendant was then
placed under arrest, administered *Miranda* warnings, and interrogated
by the police.  He was ultimately indicted for two counts of burglary
in the second degree, one count of burglary in the third degree, and
three counts of petit larceny.  While released on those charges,
defendant committed another burglary, which is the subject of the
indictment in appeal No. 2.

In its decision denying defendant's suppression motion, the court
concluded that, before encountering defendant, the information

possessed by the first officer at the scene was sufficient to support a founded suspicion that criminal activity was afoot, justifying the "limited intrusion upon defendant's freedom of movement" until the newspaper delivery woman arrived and identified defendant as the individual she had seen pulling the second bicycle.  At that point, the court determined that the first officer at the scene had reasonable suspicion to believe that defendant had committed a crime, justifying defendant's temporary detention.  When the second civilian arrived and identified the bicycle that defendant had been riding as his, the officers had probable cause to arrest defendant.

We agree with defendant that his 24-minute detention following the stop by the first officer at the scene violated his Fourth Amendment rights.  The court's determination that the officer had a "founded suspicion that criminal activity [was] afoot" justified a common-law inquiry (*People v Hollman*, 79 NY2d 181, 191), a level two intrusion under *People v De Bour* (40 NY2d 210, 223).  Pursuant to that level two intrusion, the officer was "entitled to interfere with [defendant] to the extent necessary to gain explanatory information"; he could not, however, forcibly seize defendant (*id*.).  An officer making a common-law inquiry may detain a suspect temporarily, but only "to the extent necessary to obtain explanatory information" (*People v Medina*, 107 AD2d 302, 304).

Here, the length of defendant's detention exceeded that allowed pursuant to a common-law inquiry when, after first being asked for identifying information, defendant was held for 24 minutes while the first officer at the scene went to residences in the neighborhood searching for evidence of a crime.  Once the officer began that process, defendant's temporary seizure pursuant to a lawful common-law inquiry became an investigatory detention, a level three intrusion necessitating a reasonable suspicion that defendant had committed a crime (*see People v Bruce*, 306 AD2d 68, 69, *lv denied* 100 NY2d 618; *see generally People v Ryan*, 12 NY3d 28, 29-31).  Significantly, the suppression court determined that such reasonable suspicion did not exist until the newspaper delivery woman arrived and identified defendant, which as noted was 24 minutes after the initial encounter.  "The police are not at liberty to arrest and hold a suspect while they search for evidence sufficient to justify their action" (*People v Williams*, 191 AD2d 989, 990, *lv denied* 82 NY2d 729; *see People v Williams*, 79 AD3d 1653, 1654, *affd* 17 NY3d 834 ["The officers were not at liberty to detain defendant (for 15 to 20 minutes) while other officers attempted to determine whether a burglary had in fact been committed, i.e., 'until evidence establishing probable cause could be found' "]; *see also Ryan*, 12 NY3d at 30-31 [A detention of approximately 13 minutes was not authorized, even in the event that the police had reasonable suspicion warranting a level three investigatory detention]).

We would reach the same conclusion even if, as the dissent suggests, the police did not canvass the neighborhood until after the newspaper delivery woman arrived.  The fact remains that defendant was detained for 24 minutes in the absence of reasonable suspicion.  The court specifically found that 24 minutes separated defendant's stop

and the arrival of the newspaper delivery woman, and the People do not challenge that finding on appeal.  In our view, the 24-minute detention was unlawful regardless of whether the police were going door-to-door in search of a crime during that time period.

We further conclude that a reasonable person in defendant's position would not have felt free to leave after the first officer at the scene told him that, "*after* everything checks [out]" he would be "on [his] way" and then handed defendant off to another uniformed officer while he canvassed the neighborhood in search of a crime ([emphasis added]; *see generally People v Hicks*, 68 NY2d 234, 239-240; *People v Smith*, 234 AD2d 946, 946, *lv denied* 89 NY2d 1041; *People v McFadden*, 179 AD2d 1003, 1004).

We disagree with the dissent's conclusion that defendant was not detained while the police officer conducted his investigation.  First, the suppression court specifically found that there was a "temporary detention" of defendant while the officer conducted a "further investigation."  Thus, "the hearing court did not deny suppression on that ground, and since the issue was not determined adversely to defendant, we may not reach it on appeal" (*People v Gerrard*, 94 AD3d 592, 593, citing *People v Concepcion*, 17 NY3d 192, 194-195).

In any event, none of the cases cited by the dissent supports the conclusion that defendant here was not detained.  In neither *People v Anthony* (85 AD3d 1634, *lv denied* 17 NY3d 813) nor *People v Ocasio* (85 NY2d 982) were the defendants ordered to remain in their places while the police conducted their investigations.  In *People v Smith* (234 AD2d 946, *lv denied* 89 NY2d 1041) and *People v Yukl* (25 NY2d 585, *cert denied* 400 US 851), the defendants voluntarily accompanied officers to police headquarters with no indication that they were not free to leave.  Here, in contrast, the investigating officer twice "yell[ed]" at defendant to stop riding his bike, and defendant complied with that order.  The officer then told defendant that he could leave only "after everything checks [out]," which is tantamount to telling defendant that he could not leave until things did check out.  Again, defendant complied, at which point he was handed off to another officer while the first officer investigated further.  At that point, defendant could not reasonably "disregard the police and go about his business" (*California v Hodari D.*, 499 US 621, 628).

The fact that defendant complied with the officer's requests does not mean that he was not detained.  In fact, quite the opposite is true.  A police encounter need not be forcible to constitute a seizure for Fourth Amendment purposes.  " 'Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment . . . This is true *whether a person submits to the authority of the badge* or whether he succumbs to force' " (*People v Howard*, 147 AD2d 177, 181, *lv dismissed* 74 NY2d 943 [emphasis added], quoting *People v Cantor*, 36 NY2d 106, 111).  "Submission to authority is not consent nor is a failure to argue with the police officer" (*People v Dingman*, 48 AD2d 739, 740).

Here, because defendant was twice told to stop and remain at the scene with a uniformed officer while another officer conducted an investigation, we conclude that "a reasonable person would have believed that he was not free to leave" (*United States v Mendenhall*, 446 US 544, 554; *see generally People v Hicks*, 68 NY2d 234, 239-240; *People v Smith*, 234 AD2d 946, 946, *lv denied* 89 NY2d 1041; *People v McFadden*, 179 AD2d 1003, 1004). Thus, we reverse the judgment in appeal No. 1, vacate the plea, grant that part of the omnibus motion of defendant seeking to suppress his statements, and remit the matter to County Court for further proceedings on the indictment.

With respect to appeal No. 2, "[t]he knowing, intelligent and voluntary waiver by defendant of the right to appeal encompasses his contention that County Court abused its discretion in denying his request for an adjournment to retain new counsel" (*People v Morgan*, 275 AD2d 970, *lv denied* 96 NY2d 761; *see People v La Bar*, 16 AD3d 1084, 1084-1085, *lv denied* 5 NY3d 764). In addition, "[b]y failing to object to the imposition of restitution at sentencing, which was not a part of the plea agreement, defendant failed to preserve for our review his contention that County Court erred in enhancing the sentence by imposing restitution at sentencing without affording him the opportunity to withdraw the plea" (*People v Rhodes*, 91 AD3d 1280, 1281; *see People v Lewis*, 89 AD3d 1485, 1486; *People v Lovett*, 8 AD3d 1007, 1007-1008, *lv denied* 3 NY3d 673, 677). We decline to exercise our power to review that contention as a matter of discretion in the interest of justice (*cf. Rhodes*, 91 AD3d at 1281).

All concur except PERADOTTO, J., who dissents and votes to affirm in the following Memorandum: I respectfully dissent in part because I disagree with the majority that defendant was illegally detained in violation of his Fourth Amendment rights. I would therefore affirm the judgment in appeal No. 1 convicting defendant, upon his plea of guilty, of burglary in the second degree (Penal Law § 140.25 [2]) but, like the majority, I would affirm the judgment in appeal No. 2.

In the early morning hours of July 16, 2004, the Irondequoit Police Department received a telephone call from a local Town Justice who reported a suspicious male "[p]ossibly stealing bikes." In response to the report, a police officer drove to the residence of the Town Justice, who showed the responding officer a bicycle in his driveway and told the officer that his newspaper carrier had stopped a man who was pulling that bicycle while riding another bicycle. The newspaper carrier suspected that the man, whom she described as a black male wearing a dark hooded sweatshirt and jeans, might be stealing bicycles in the area. The officer returned to his patrol car and began checking the area for the suspect.

Shortly thereafter, at approximately 6:21 A.M., the officer observed defendant, a black male wearing a dark hooded sweatshirt and greenish-colored jeans, emerging from a backyard on a bicycle. The officer sent a dispatch that he saw a person matching the description of the possible bicycle thief, and he drove toward defendant. Defendant, who had been riding in the street, steered his bicycle onto the sidewalk. The officer pulled up alongside defendant and asked him

to stop.  Defendant did not comply, possibly because he did not hear the officer.  When the officer repeated his request, defendant complied.  The officer stopped and then exited his patrol car, and walked over to where defendant was standing on the sidewalk.

Defendant testified at the suppression hearing that the officer told him that he "wanted to ask [defendant] a few questions, a couple questions."  The officer testified that he approached defendant and "told him that we had a report of a suspicious male possibly stealing bikes and that the description of the male was a male black wearing a darker . . . hooded sweatshirt and jeans, and as you can see you fit the description, so I just have to make an inquiry and you'll be on your way if everything's okay."  On cross-examination, the officer similarly testified that, when he initially stopped defendant, "I told him why I stopped him . . . [J]ust to keep him at ease.  I told him after everything checks [out], you'll be on your way."

The officer then asked defendant a number of questions, including his name, whether he owned another bike, where he had been, what he was doing in the neighborhood, whether he lived in the neighborhood, and why he had emerged from a backyard.  Defendant denied having a second bicycle.  As the officer was questioning defendant on the sidewalk, the newspaper carrier arrived at the scene and identified defendant as the person she had observed earlier in the morning with the two bicycles.  The officer testified that the newspaper carrier arrived "[w]ithin a short time" after he stopped defendant.

At the suppression hearing, defense counsel extensively questioned the officer about the timing of the newspaper carrier's arrival, noting that a supporting deposition taken by another officer from the newspaper carrier placed her arrival at 6:45 A.M.  Defense counsel asked the officer whether the supporting deposition would "refresh [his] memory as to what time [the newspaper carrier] happened on the scene of the stop," and the officer replied, "I already told you it was during the conversation shortly after I stopped him that she arrived."  When asked whether he had a "specific independent recollection of the time," the officer replied, "I do have a very good recollection that it was shortly after I stopped him . . . While I was talking to him while I was making my inquiry as to who he is, where he's coming from, does he live here, why [did] you come from somebody's yard and what's going on."  The officer's testimony that the newspaper carrier arrived shortly after he stopped defendant and while he was making his initial inquiries of defendant is supported by defendant's own testimony at the suppression hearing.  Defendant estimated that "approximately three minutes" elapsed from the time he was stopped until the time the newspaper carrier arrived.

After the newspaper carrier identified defendant, the officer asked defendant why he had lied about having a second bicycle.  The officer then left defendant on the sidewalk with a second officer while he "check[ed] the houses that [defendant] emerged from, the yards," for evidence of a break-in.  The first officer testified that he checked the exterior of three houses and woke up the occupants to ask if they were okay, a process that he testified took a "short

time."  Within approximately 15 minutes, a third officer arrived with a civilian who identified the bicycle that defendant was riding as his own.  At that point, the police placed defendant under arrest and issued *Miranda* warnings.  During subsequent interrogation, defendant admitted that he stole the two bicycles in his possession that morning.

Contrary to the conclusion of the majority, I conclude that the court properly refused to suppress the statements defendant made to the arresting officer.  It is well established that "[g]reat deference is afforded the findings of the suppression court" (*People v Davis*, 48 AD3d 1120, 1122, *lv denied* 10 NY3d 957; *see People v Prochilo*, 41 NY2d 759, 761), and that "[t]he suppression court's credibility determinations and choice between conflicting inferences to be drawn from the proof . . . will not be disturbed unless unsupported by the record" (*People v Esquerdo*, 71 AD3d 1424, 1424, *lv denied* 14 NY3d 887 [internal quotation marks omitted]; *see People v Sanders*, 74 AD3d 1896; *People v Youngblood*, 294 AD2d 954, 955, *lv denied* 98 NY2d 704).

In evaluating police conduct, we "must determine whether the action taken was justified in its inception and at every subsequent stage of the encounter" (*People v Nicodemus*, 247 AD2d 833, 835, *lv denied* 92 NY2d 858).  Here, the suppression court determined that, when the officer first encountered defendant on the bicycle, the report from the Town Justice coupled with the officer's observations provided a founded suspicion that criminal activity was afoot and thus justified the second level of intrusion under *People v De Bour* (40 NY2d 210), i.e., the common-law right of inquiry (*see People v Moore*, 6 NY3d 496, 498-499; *De Bour*, 40 NY2d at 223).  I agree.  The officer observed defendant, who fit the description of the reported possible bicycle thief, emerging from a residential backyard on a bicycle during the early morning hours, shortly after the report and approximately one block away from the location of the second bicycle. The officer was thus permitted to effect "a detention short of a forcible seizure to obtain explanatory information" (*People v White*, 35 AD3d 1263, 1264, *lv denied* 8 NY3d 947, 951; *see Moore*, 6 NY3d at 500; *De Bour*, 40 NY2d at 223).  The officer therefore was justified in approaching defendant, asking him to stop, requesting his name, and asking him various questions about his conduct and the bicycle he was riding.

I likewise agree with the suppression court's further determination that, when the newspaper carrier arrived and identified defendant as the individual she had seen pulling the second bicycle, the officer had reasonable suspicion to believe that defendant had committed a crime so as to "support the temporary detention of the defendant for further investigation."  The majority does not take issue with that determination of the suppression court, but concludes that defendant was illegally "detained" for 24 minutes following the stop by the first officer on the scene.  I disagree.

In my view, the facts do not support the majority's determination that, "after first being asked for identifying information, defendant

was held for 24 minutes while the first officer at the scene went to residences in the neighborhood searching for evidence of a crime." Although the testimony at the suppression hearing is not entirely clear on this point, it appears that the first officer checked the surrounding houses for signs of a break-in *after* the newspaper carrier identified defendant, i.e., in the 15 minutes between the newspaper carrier's arrival on the scene and the civilian's identification of the bicycle defendant had been riding.  When defense counsel asked the first officer "[w]hat was the purpose of staying for another 15 minutes or more after [the newspaper carrier] had said that's the guy that I took the bike from," the first officer replied that he was "not done with [his] check of the yards" or his inquiry as to why defendant had lied about possessing a second bicycle.

Notably, defendant stated in support of his suppression motion that, "*[a]fter [the newspaper carrier] identified the defendant as the person she had seen earlier*, the Irondequoit Police Department conducted a house-to-house canvass of the neighborhood to determine if anyone had been the victim of a theft" (emphasis added).  Moreover, the suppression court specifically found that the newspaper carrier arrived during the officer's initial questioning of defendant.  In its decision, the court stated that, "[w]hile the [first] officer was obtaining information from the defendant, . . . the newspaper carrier . . . arrived and identified the defendant as the person she observed earlier pulling the bike left in [the Town Justice]'s driveway." Thus, according due deference to the suppression court's findings (*see Prochilo*, 41 NY2d at 761; *Davis*, 48 AD3d at 1122), I submit that the record does not support the majority's conclusion that the police "held" defendant while the first officer canvassed the neighborhood for evidence of a crime.

In any event, even assuming, arguendo, that the first officer searched nearby houses prior to the arrival of the newspaper carrier, I conclude that defendant was not thereby subjected to a level three forcible detention (*see Moore*, 6 NY3d at 498-499).  The Court of Appeals has defined "a seizure of the person for constitutional purposes to be a significant interruption with an individual's liberty of movement" (*De Bour*, 40 NY2d at 216).  In *People v Ocasio* (85 NY2d 982, 984), the Court explained that the determination whether a seizure occurred "requires the fact finder to apply a settled standard:  whether a reasonable person would have believed, under the circumstances, that the officer's conduct was a significant limitation on his or her freedom . . . ."  Such a determination "involves consideration of all the facts—for example, was there a chase; were lights, sirens or a loudspeaker used; was the officer's gun drawn, was the individual prevented from moving; how many verbal commands were given; what was the content and tone of the commands; how many officers were involved; [and] where did the encounter take place" (*id.*).

The record reflects that the entire encounter, which did not exceed 24 minutes, took place on a public sidewalk, and that defendant was not handcuffed or restrained in any manner (*see People v Anthony*, 85 AD3d 1634, 1635, *lv denied* 17 NY3d 813; *cf. People v Evans*, 294

AD2d 918, 918-919, *lv dismissed* 98 NY2d 768).  No officer displayed a weapon, the police did not act in an abusive or threatening manner, and there was no evidence that the police physically blocked defendant or otherwise interfered with his freedom of movement (*see Ocasio*, 85 NY2d at 984; *cf. People v Layou*, 71 AD3d 1382, 1383).  While defendant was standing on the sidewalk, he consumed a soda and snacks that he had with him (*see People v Smith*, 234 AD2d 946, *lv denied* 89 NY2d 1041).  The first officer testified that defendant never asked to leave or complained that he was treated with disrespect.  Concerning the issue whether defendant was free to leave, the first officer testified that, "[i]f [defendant] said I'm leaving unless you're going to handcuff me . . . [, h]e would have been walking.  I already knew his name."  "Although it may be possible that [defendant] felt obliged to cooperate with the police in order to maintain his facade of innocence, this subjective view by the defendant does not require that we find him to have been in custody" (*People v Yukl*, 25 NY2d 585, 591-592, *cert denied* 400 US 851).

Finally, I disagree with the majority that a reasonable person in defendant's position would not have felt free to leave after the first officer told defendant that he "just ha[d] to make an inquiry and you'll be on your way if everything's okay" or "after everything checks [out], you'll be on your way."  The officer testified that he made a statement to that effect upon first approaching defendant "just to keep him at ease" and to explain why he had stopped defendant.  Defendant did not testify concerning any such statement by the first officer, recalling only that the first officer approached and told him that he "wanted to ask [defendant] a few questions, a couple questions."  In my view, the first officer's statement, unaccompanied by any showing of force or other facts suggesting that defendant was not free to leave, did not elevate the level two encounter to a level three forcible detention (*see People v Lopez*, 71 AD3d 1518, 1518-1519, *lv denied* 15 NY3d 753; *People v Bent*, 206 AD2d 926, 926, *lv denied* 84 NY2d 906).

I would therefore affirm the judgments in appeal Nos. 1 and 2.

Entered:  June 15, 2012                          Frances E. Cafarell
                                                 Clerk of the Court