# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 78
The People &c.,
   Respondent,
  v.
Lance Rodriguez,
   Appellant.

Hannah Kon, for appellant.
Mariana Zelig, for respondent.
Alice Ristroph et al.; Transportation Alternatives et al.; The Legal Aid Society, amici curiae.

RIVERA, J.:

   Late one winter evening, defendant was riding his bicycle down a road in Queens, New York, when several New York City Police Department officers drove alongside him and twice asked him to stop. Defendant complied and, in response to an officer's inquiry,

- 1 -

acknowledged that he was carrying a gun which turned out to be loaded. Afterwards, he pleaded guilty to a weapons charge. The question presented on this appeal is whether the officers violated the federal and state constitutions when they stopped defendant. We conclude that they did and hold that police interference with a bicyclist is a seizure requiring reasonable suspicion of a criminal offense or probable cause of a Vehicle and Traffic Law violation.

I.

Defendant was indicted on several weapons counts based on allegations that, after the police stopped him on his bicycle, he admitted he was carrying a loaded firearm in his waistband, which the police recovered. Defendant moved to suppress the gun and his statements as products of an unlawful seizure.

During the suppression hearing, one of the officers testified that he and two other officers were patrolling in an unmarked police cruiser in Queens. At some point, the officers turned onto a two-way road running north-south when they saw defendant—who he described as "a male Hispanic"—roughly 20 to 25 yards away riding south on a beach-cruiser bicycle. Defendant was wearing sweatpants, a puffy "snorkel" jacket, and a hat. The road did not have a center-lane divider or a bike lane, and cars could park legally on its east side.

 Three details drew the officers' attention to defendant. First, defendant was riding the bicycle down the middle of the road in a "somewhat reckless" fashion in that "two or three cars" had to "stop so they didn't hit him or go around him," although the officer acknowledged that the defendant was not charged with any traffic infractions. Second,

defendant had only his right hand on the handlebars. And third, defendant was "favoring his waistband" and holding "something" with his left hand over his pants. The officer did not know what the "object" was except that it was "bulky."

The officers followed the defendant with one vehicle between their patrol car and the defendant's bicycle. Less than a minute later and shortly before the defendant reached an intersection, the officers pulled alongside the defendant and either "said" or "yelled out" "Police, stop" or "Hold up, police." Defendant did not stop right away, so the officers continued following him and "commanded" him to stop a second time, yelling "even louder" either "stop the bicycle, police" or "[h]old up, police." Defendant then turned right onto a side street and stopped his bike.

The officers pulled alongside defendant. Defendant straddled the bike next to the testifying officer's passenger-side door. Through the open car window, the officer identified himself as police and asked the defendant if he had "anything on him" and the defendant answered he did. The officer was "caught . . . off guard" and repeated his question, and the defendant confirmed that he was carrying something. The officer then asked defendant to "step back" so that he could exit the car, at which point he repeated his question. Defendant responded that he had a "gun in [his] waistband."[1] The officer

---

[1] Defendant testified, in direct contradiction to the officer, that: (1) an officer exited the front passenger door of the patrol car and immediately began patting him down while asking whether he was carrying anything; and (2) defendant never admitted that he was carrying a gun.

restrained defendant while his sergeant recovered a gun. The gun was loaded with eight

rounds and its chamber was empty.  The officers then arrested defendant.

Supreme Court denied suppression, concluding that defendant had not been seized

and that the officers' observations provided "founded suspicion" for the stop (*People v*

*De Bour* 40 NY2d 210, 223 [1976]).[2] Defendant subsequently waived his right to appeal,

pleaded guilty to a reduced count and was sentenced to two years' incarceration and 1½

years of post-release supervision.

The Appellate Division affirmed based on the appeal waiver (176 AD3d 1111 [2d

Dept 2019]), but we reversed after concluding the waiver was "invalid and unenforceable"

(*People v Bisono*, 36 NY3d 1013, 1017-1018 [2020]). On remittitur, the Appellate Division

again affirmed, concluding that an officer's encounter is subject to *De Bour* analysis and

that the officers here had engaged in a justified common-law inquiry when they stopped

defendant (194 AD3d 968 [2d Dept 2021]). We now reverse and make clear that, like a

stop of a motor vehicle, a stop of a bicyclist is a seizure under both the federal and state

constitutions.

## II.

Both the Fourth Amendment to the United States Constitution and Article I, § 12 of

the New York Constitution prohibit "unreasonable searches and seizures" (US Const

---

[2] The court also denied a separate branch of defendant's motion to suppress his roadside admissions that he was carrying a gun as the fruits of a *Miranda* violation, reasoning that temporarily-detained individuals are not in custody for *Miranda* purposes (*see generally Miranda v Arizona*, 384 US 436 [1966]). This branch of defendant's motion is not at issue in this appeal.

Amend IV; NY Const, art I, § 12). Under the Fourth Amendment, "a person is seized only when, by means of physical force or a show of authority, [their] freedom of movement is restrained" and, to determine this, courts examine "all of the circumstances surrounding the incident" and ask whether "a reasonable person would have believed that [they were] not free to leave" (*United States v Mendenhall*, 446 US 544, 553 [1980]). Applied to police pursuits, the police seize an individual under the federal constitution only once the individual either submits to police authority or, if the individual does not submit, is subdued by force (*California v Hodari D.*, 499 US 621, 626-628 [1991]). "The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity" (*Navarette v California*, 572 US 393, 396-397 [2014]; *Terry v Ohio*, 392 US 1, 21-22 [1968]). A stop is thus constitutional where there exists "reasonable suspicion" of criminal activity based on "the totality of the circumstances" (*Navarette*, 572 US at 397 [internal quotation marks omitted]).

However, federal law draws a bright line for traffic stops. Under the Fourth Amendment, "stopping an automobile and detaining its occupants constitutes a seizure" because, as the Supreme Court has explained, automobile stops "generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority" that "may create substantial anxiety" (*Delaware v Prouse*, 440 US 648, 653, 657 [1979] [internal quotation marks omitted]). These realities have given rise to "a societal expectation" that a police officer's order to

pull a car over is an "unquestioned police command" (*Brendlin v California*, 551 US 249, 258 [2007]).

The Court has reached similar conclusions under our State's constitution and the common law (*People v Hollman*, 79 NY2d 181, 195 [1992]), which, the Court has said, enshrine the individual's "right to be let alone and refuse to respond to police inquiry" (*People v Holmes*, 81 NY2d 1056, 1058 [1993] [internal quotation marks omitted]; *see also People v May*, 81 NY2d 725, 728 [1992]).[3] Applying these principles in the automobile-stop context, the Court has concluded that diversion of an automobile from the flow of traffic "is a seizure implicating constitutional limitations" (*People v Spencer*, 84 NY2d 749, 752 [1995]), even if the automobile is temporarily stopped at a stop sign (*People v Sobotker*, 43 NY2d 559, 562-564 [1978]) and even if " 'the purpose of the stop is limited and the resulting detention quite brief' " (*Spencer*, 84 NY2d at 752, quoting *Prouse*, 440 US at 653).[4] In New York, such seizures "are lawful only when based on probable cause that a driver has committed a traffic violation" or "when based on a

---

[3] *See also Olmstead v United States* (277 US 438, 478 [1928] [Brandeis, J., dissenting] [observing that the Framers of the Fourth Amendment "conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued"]).

[4] For example, in *People v Ocasio*, the Court upheld the suppression court's determination that there was "no seizure" of the defendant when two officers walked up to his car window and requested his identification while he was stopped at a red light (85 NY2d 982, 984 [1995]) and made clear in *People v Harrison*, that the same is true when the police approach a parked car (*see* 57 NY2d 470, 475-476 [1982]). By contrast, in *Sobotker*, the Court held that the police seized the defendant when they directed him to pull his car over to a curb after they saw him "proceeding slowly" before he "came to a standstill at [a] stop sign" (43 NY2d at 562-564).

reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime" (*People v Hinshaw*, 35 NY3d 427, 430 [2020] [internal quotation marks and citations omitted]).

Like an automobile stop, a bicycle stop is a traffic stop that involves a show of governmental authority (*see Prouse*, 440 US at 657), and triggers "anxiety" in the individual (*id.*) in a manner that implicates the same social expectations regarding how reasonable people react to such authority (*see Brendlin*, 551 US at 258). Whether an individual is driving a car or riding a bike, a police order to stop requires them to halt their momentum based on the expectation that any "attempt to leave the scene would be so obviously likely to prompt an objection from the officer that" no bicyclist "would feel free to leave in the first place" (*id.* at 257). Bicycle stops also implicate, in a similar manner to automobile stops, the "right to be let alone and to refuse to respond to police inquiry" (*May*, 81 NY2d at 728), a constitutional right that would be rendered meaningless for bicyclists if we were to regard the rider's compliance with a police request to stop as anything other than a full-blown seizure. Indeed, there is no meaningful constitutional distinction between an officer commanding a driver traveling at five miles per hour to stop their car—as was the case in *Sobotker* (43 NY2d at 562-564)—and the same officer commanding a cyclist riding at the same speed to stop their bicycle.[5]

---

[5] Bicycles also travel at faster speeds (*see* Peter Minarik, *What's the Average Cycling Speed and How to Improve It?*, CyclistsHub.Com [Oct 6, 2023], *available at* https://www.cyclistshub.com/average-cycling-speed/ [last accessed Oct 27, 2023] [presenting data showing that most leisure riders average between 9 and 14 miles per hour and that professional cyclists average close to 25 miles per hour]).

The dissent rejects this comparison, positing that the police must engage in more "significant show[s] of authority to stop a motor vehicle" than a bicycle because, it reasons, the police "almost always" must "activate their car's lights or sirens, or block the vehicle's movement, resulting in 'a possibly unsettling show of authority' and potentially creating 'substantial anxiety' " and that "much less is typically required to stop a bicycle (dissenting op at 9, quoting *Prouse*, 440 US at 657). This may be true but does little to further the dissent's position since the police may make these same displays of authority to a bicyclist. Moreover, whether directed at a driver or a bicyclist, a command to stop by armed agents of the State is unsettling, frightening and destabilizing. Indeed, an armed officer's command to stop—in this case, from a moving car—arguably constitutes a *more* robust display of authority and, in turn, induces *more* anxiety than lights and sirens. And, when a police vehicle passes or runs parallel to a bicyclist the rider is physically vulnerable in ways that an automobile driver is not. The sudden wind loads and aerodynamic forces acting on a bicyclist create instability and loss of control, potentially leading to injurious collisions and falls.

---

The dissent disputes none of the above, but instead pivots to an unsupported assertion that "the vast majority of cars in New York" operate at "great speeds" (dissenting op at 9). The dissent fails to explain how the absolute number of drivers travelling fast on highways and throughfares bears on the authority of the police to stop bicyclists travelling at all speeds. Cases like *Sobotker* remind us, among other things, that individual rights turn on the nature and extent of intrusive government actions, not the frequency with which they occur (*see Faretta v California*, 422 US 806, 834 [1975] ["Personal liberties are not rooted in the law of averages"]).

Moreover, once the police initiate contact, a reasonable bicyclist ordered to stop would not feel free to ride away (*cf. May*, 81 NY2d at 728). Indeed, "studies over the last several decades on the social psychology of compliance, conformity, social influence, and politeness have all converged on a single conclusion: the extent to which people feel free to refuse to comply is extremely limited under situationally induced pressures" (Janice Nadler, *No Need to Shout: Bus Sweeps and the Psychology of Coercion*, 2002 Sup Ct Rev 153, 155 [2002] [collecting and summarizing studies]). The dissent ignores this long-known, popularly-understood reality. By contrast, our analysis is grounded in the very "reasonableness" which the dissent insists should be its "touchstone" (dissenting op at 6), in that it appropriately squares our search and seizure jurisprudence with this basic reality.

The dissent appears troubled by the effects of today's decision on the actions of the police, yet also seems internally conflicted. On the one hand, the dissent appears distressed over our holding's purported encouragement of more "pretextual stops" and potential to erode "privacy for . . . [bi]cyclists" (dissenting op at 11). However, this fear is unfounded. To borrow the dissent's phrasing, the rule we set today not only "ensures that bicyclists cannot be stopped based on an officer's hunch or curiosity" (dissenting op at 10), but also ensures that the police may not initiate an encounter with them absent reasonable suspicion of a crime or probable cause of a traffic violation. The dissent should train its alarm on its own approach which, by permitting police intrusions upon a bicyclist on lesser quanta of proof, would promote the very pretextual stops it fears (dissenting op at 10-12). Our application to bicyclists of the well-understood automobile exception follows logically from our precedents and strikes a sensible balance between "the government's interest in

the detection and apprehension of criminals against the encroachment involved with respect to an individual's right to privacy and personal security" (*People v Cantor*, 36 NY2d 106, 111 [1975]). The dissent's approach would greatly diminish the latter interest.

Contradicting itself, the dissent also urges that our holding will result in too few stops and arrests, claiming—without any basis in fact or law—that, after today, "instead of acting to rid our streets of the deadly menace presented by loaded firearms, the police will be forced to ignore a cyclist with a waistband bulge, for no reason other than that the person happened to be riding a bicycle" (dissenting op at 10). Hardly. And hyperbole is not constitutional analysis. Indeed, nothing in today's decision remotely requires the police to leave "what is seen . . . unseen" (dissenting op at 11), that is, to cease surveillance of bicyclists with suspiciously bulky waistbands. It merely reminds them of the constitutional limitations on their ability to intrude upon those bicyclists' personal liberty without some additional proof of criminal wrongdoing (*see e.g. Holmes*, 81 NY2d at 1058 [reasonable suspicion was absent where "defendant st(ood) in an area known for drug trafficking with an unidentified bulge in his jacket pocket"]; *People v Stewart*, 41 NY2d 65, 69 [1976] [observing that "a bulge in the pocket, unlike a waistband bulge, could be caused by any number of innocuous objects"]).

Treating bicycle stops the same as other traffic stops also accords with the Vehicle and Traffic Law (VTL), which subjects bicyclists to the same rules of the road as those applicable to automobiles. While the VTL does not include bicycles within its definition of "vehicles" (*see* VTL § 159), it grants bicyclists "all of the rights" and "subject[s]" them

"to all of the duties applicable to the driver of a vehicle" (VTL § 1231).[6] For example, just as automobiles must contain lights visible for at least 500 feet during non-daylight hours (*see* VTL § 1223), when ridden in the dark, bicycles similarly must have a lamp on the front that emits a white light and one on the back that emits a red light, and both lights must be visible for at least 200 feet from each side (VTL § 1236 [a]). The VTL also requires bicycles to have reflective tires or reflectors mounted on the spokes of each wheel (VTL § 1236 [d]).

In addition, just as "[e]very motor vehicle" must have "a suitable and adequate horn or other device for signaling . . . sufficiently loud to serve as a danger warning" (VTL § 375 [1] [a]), a bicycle must have "a bell or other [audible] device" that can be heard for at least one hundred feet (VTL § 1236 [b]). Just as the VTL requires automobile drivers and certain passengers to wear seat belts (VTL § 1229-c), bicyclists younger than fourteen must wear helmets (VTL § 1238 [5]). An automobile driver must properly signal before turning right or left (VTL § 1163 [b]) and, similarly, cyclists must signal upcoming turns using their hands or arms to warn others (VTL § 1237). Finally, and most significantly, bicyclists are sometimes restricted to riding on "public roadways" (VTL §§ 1100 [a]; *see*

---

[6] The dissent summarily dismisses VTL § 1231's vesting of bicyclists with the same rights and imposition of the same duties as automobile drivers and—without citation to any authority—asserts that the VTL's objective is "to ensure the safe flow of traffic" (dissenting op at 8). This tautological statement of purpose is simply irrelevant to the dissent's broader disagreement with our analogies to the VTL. Regardless of whether the safe flow of traffic is the goal—as can be said of all VTL provisions—the VTL's similar regard for automobile drivers and bicyclists on our public roadways buttresses the legally-significant similarities between them for search-and-seizure purposes.

*e.g.* NYC Administrative Code § 19-176 [prohibiting bicycle riding on sidewalks]; City of Rochester Code § 34-2 [same in Center City District]), where "[n]o person" may "fail or refuse to comply with any lawful order" (VTL § 1102).

By contrast, the VTL regulates pedestrians in a more limited fashion. Article 27 of the VTL contains a special list of pedestrian-only restrictions that requires them to, for example, obey "traffic control signals" (VTL § 1150), yield to vehicles outside of crosswalks and, when walking outside of crosswalks, requires pedestrians to cross the street in a straight line rather than diagonally (VTL § 1152), walk only on sidewalks where they are provided (VTL § 1156), and refrain from obstructing traffic (VTL § 1157).

The dissent's uncontroversial observation that "a bicycle simply is not a car" is of no moment (dissenting op at 8); we agree that the two are different forms of transportation. The point is that, in every relevant, legally-significant way, bicycles are similar to cars for purposes of a police encounter. Consequently, the Federal and State Constitutions shield bicyclists from unwarranted government intrusions to the same extent as they do with respect to motorists. We therefore conclude that bicycle stops, like automobile stops, are seizures under both constitutions, which the police lack the authority to conduct absent reasonable suspicion of criminal activity or probable cause that the bicyclist has violated the rules of the road (*see Hinshaw*, 35 NY3d at 430).[7]

---

[7] The dissent asserts that "[t]he Supreme Court has made 'clear that for the most part *per se* rules are inappropriate in the Fourth Amendment context' " (dissenting op at 4-5, quoting *United States v Drayton*, 536 US 194, 201 [2002] [internal quotation marks omitted]). But per se rules—especially ones favoring governmental authority—are hardly foreign to the Supreme Court's Fourth Amendment jurisprudence (*e.g. Michigan v Summers*, 452 US 692, 705 [1981] [holding that officers executing a search warrant may

III.

"Like all seizures, the officer's action[s]" during a traffic stop "must be justified at its inception" (*Kansas v Glover*, 589 US __, 140 S Ct 1183, 1191 [2020]). Here, the officers' actions were unjustified from the beginning because, as the prosecution concedes, the police possessed neither probable cause of a VTL violation nor reasonable suspicion of criminality (*Hinshaw*, 35 NY3d at 430). Although the officer vaguely commented during the suppression hearing that defendant was riding "in a somewhat reckless manner," he did not testify that he suspected a VTL violation—let alone that he had probable cause of one.[8]

_____

"detain the occupants of the premises while a proper search is conducted" regardless of the "quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure"]; *United States v Robinson*, 414 US 218, 235 [1973] [establishing a bright-line rule "that in the case of a lawful custodial arrest a full search of the person is . . . a 'reasonable' search" under the Fourth Amendment]). The dissent conveniently ignores that the Supreme Court has established a per se rule for traffic stops similar to the one we extend to bicyclists today (*see Prouse*, 440 US at 657). And, to be clear, we rest our holding on both the Fourth Amendment and Article I, § 12 of the State Constitution, which the dissent acknowledges provides greater protections than the federal constitution (*see* dissenting op at 4).

Likewise overstated is the dissent's concern that our rule leaves lower courts to "speculate" about its precise boundaries—i.e., whether it applies only to bicyclists on public roadways, to moving bicyclists only, or to "some other as yet undefined class of [bi]cyclists" (whatever that means) (dissenting op at 6). What the dissent terms as "speculat[ion]" is what lawyers and judges call judicial analysis. Just as courts, including this one, have determined over time which automobile stops fall within *Prouse's* bright-line rule and which do not we have confidence that our state courts' can do the same for bicycle stops (*see e.g. Sobotker*, 43 NY2d 562-564; *Harrison*, 57 NY2d at 475-476; *Ocasio*, 85 NY2d at 984; *Spencer*, 84 NY2d at 752).

[8] Although VTL § 1234 (a) requires bicyclists to ride in "a usable right-hand shoulder" of the roadway, it permits bicyclists to leave the right edge of the road "when preparing for a left turn or when reasonably necessary to avoid conditions that would make it unsafe to

Instead, the officer testified that the primary motivation for the stop was that defendant was "holding an object in his waistband," but admitted that he did not know what the "object" was, except that it was "bulky." This observation of course fell well short of establishing reasonable suspicion of criminality (*see e.g. Holmes*, 81 NY2d at 1058; *Stewart*, 41 NY2d at 69). Indeed, at no point before the stop did the officers suspect defendant was carrying contraband and, in fact, they were "caught . . . off guard" after the stop, when defendant admitted that he was carrying a gun.[9]

## IV.

An officer's stop of a moving bicyclist constitutes a seizure. On the record before us, Supreme Court should have suppressed the gun as the product of an impermissible stop

---

continue along near the right-hand curb or edge" (VTL § 1234 [a]). Moreover, VTL § 1642 permits cities with populations exceeding one million people—like New York City—to supersede the VTL with local traffic regulations, which New York City has done regarding regulations of bicyclists (*see* 34 RCNY 4-02 [e]). Those regulations contain nothing restricting bicycle riding to the right side of the road (*see generally* 34 RCNY 4-02).

[9] Of course, defendant's post-seizure behavior "cannot validate an encounter," like the one here, "that was not justified at its inception" (*People v Moore*, 6 NY3d 496, 498 [2006]). Indeed, the Court's observation that events following the stop in *Sobotker* were irrelevant to its legality are no less apt in the case of a bicycle stop (*see* 43 NY2d at 565). As the *Sobotker* Court explained:

> "[A] search may not be justified by its avails alone. Constitutionally protected rights are not to be dispensed with in this case solely because the results of the improper search and seizure uncovered the fact that one or all of the persons who were its targets were armed with a deadly weapon. Almost any series of indiscriminate seizures is bound to produce some instances of criminality that might otherwise have gone undetected or unprevented. But were hindsight alone to furnish the governing criteria, a vital constitutional safeguard of our personal security would soon be gone" (*id.*).

because the officers lacked reasonable suspicion of criminal activity or probable cause that defendant had violated the rules of the road while riding his bicycle. Since no other admissible evidence exists to establish the crime, the prosecution would be unable to secure a conviction on the gun possession count without the gun recovered from defendant and his statements to the police. Therefore, the indictment must be dismissed (*see e.g. Hinshaw*, 35 NY3d at 439).

Accordingly, the order of the Appellate Division should be reversed, defendant's motion to suppress granted and the indictment dismissed.

SINGAS, J. (dissenting):

A police officer observed defendant Lance Rodriguez riding a bicycle while clutching a bulky object at his waistband. The officer asked defendant to stop and, upon doing so, defendant admitted that he was carrying a gun. Today, the majority abandons

- 1 -

this Court's long-settled precedent, overturns a gun conviction stemming from reasonable police action, and creates a new rule that transforms any stop of a bicycle from a facts and circumstances inquiry into a per se seizure. Because I would adhere to our well established jurisprudence, and because stare decisis principles should not be so carelessly disregarded, I dissent.

## I.

At approximately 10:40 p.m. on December 13, 2014, in the Far Rockaway section of Queens, Officer Richard Schell was on patrol in plainclothes in an unmarked car with two other police officers. The officers saw defendant riding his bicycle in the street "in a somewhat reckless manner," such that cars had to "either stop so they didn't hit him or go around him." Defendant had one hand on the bicycle's handlebars. The other hand was holding "a bulky object" at the waistband of his pants.

As defendant made a turn on his bicycle, Officer Schell called out, "[h]old up, police," but defendant continued on. The officers drove behind him for a short distance before Officer Schell yelled, "hold up, police" or "stop the bicycle, please." Defendant stopped this time. Up to this point, the officers had not activated their lights or sirens, or impeded defendant's path with their vehicle. Speaking through the car's open window while seated inside, Officer Schell asked defendant "if he had anything on him." When defendant said that "he did," it caught Officer Schell "off guard" so he "asked him again." Defendant confirmed that he had something on him. Officer Schell exited the vehicle, and defendant admitted that he had a gun in his waistband and put his hands in the air. The other officers then got out of the car, frisked defendant, and recovered a loaded .40 caliber

pistol, with eight rounds in the magazine, from his waistband.  The officers never drew their weapons.

Supreme Court denied defendant's motion to suppress the weapon and defendant's statements.  Defendant subsequently pleaded guilty to attempted criminal possession of a weapon in the second degree.  The Appellate Division ultimately affirmed the judgment, concluding that Supreme Court "properly determined that" the police "were justified in making a common-law inquiry" and that, based on the circumstances here, their encounter with defendant was not a seizure (194 AD3d 968, 971 [2d Dept 2021]).

On these facts, the majority now reverses, suppresses the gun, and dismisses the indictment, "hold[ing] that police interference with a bicyclist is a seizure" (majority op at 2).  Because the Appellate Division correctly rejected defendant's invitation to create an amorphous "bicycle rule" that conflicts with our settled law, I would affirm.

## II.

Although "the search and seizure provision of the State Constitution is similar to the wording of the Fourth Amendment . . . , we have held that our [s]tate provision, for reasons peculiar to New York, is subject to its own interpretation" (*People v Bora*, 83 NY2d 531, 534 [1994]).  For nearly 50 years, New York's search and seizure law has been governed by *People v De Bour* (40 NY2d 210 [1976]).  The majority largely ignores this seminal case, but in *De Bour* we "established a four-tiered framework for evaluating the propriety of police-initiated encounters with civilians" (*People v Johnson*, 40 NY3d 172, 174 [2023]; *see People v Moore*, 6 NY3d 496, 498 [2006]).  By doing so, we "adopted greater protections" than that required under the Federal Constitution "for pedestrian stops by the

police" (*People v Hinshaw*, 35 NY3d 427, 431 [2020]).  *De Bour* "is more protective of

the rights of individuals 'to be free from aggressive governmental interference' " (*id.*,

quoting *De Bour*, 40 NY2d at 216), guiding police conduct that "fall[s] below the level of

a Fourth Amendment seizure" (*People v Hollman*, 79 NY2d 181, 196 [1992]).  We

established levels one and two, the request for information and the common-law inquiry,

to ensure that police encounters with people in New York that "do[ ] not rise to a seizure"

under federal law are "predicated on more than a hunch, whim, caprice[,] or idle curiosity"

(*People v Ocasio*, 85 NY2d 982, 985 [1995]).  Those extra levels of protection find no

counterpart in federal law.[1]

We have established that "[t]here are no bright lines separating various types of

police activity" under *De Bour* (*Bora*, 83 NY2d at 535; *see Hollman*, 79 NY2d at 192 [there

is no "bright line test for distinguishing between" *De Bour*'s levels]).  The Supreme Court

has made "clear that for the most part *per se* rules are inappropriate in the Fourth

Amendment context.  The proper inquiry necessitates a consideration of all the

circumstances surrounding the encounter" (*United States v Drayton*, 536 US 194, 201

[2002] [internal quotation marks omitted]).

Bright lines are inadvisable in the search and seizure context because applying this

law is " 'largely based upon considerations of reasonableness' " (*Hinshaw*, 35 NY3d at

---

[1] The majority concludes that "the officers violated the [F]ederal and [S]tate [C]onstitutions when they stopped defendant," presuming a federal bicycle rule and creating a new per se rule for New York (majority op at 2).  I focus my analysis on New York law because our precedent affords defendant more protection than the Federal Constitution, and I conclude that his rights under New York law were not violated.

431, quoting *Hollman*, 79 NY2d at 195).  "Determining whether a seizure occurs during the course of a street encounter between the police and a private citizen involves an analysis of the 'most subtle aspects of our constitutional guarantees' " (*Bora*, 83 NY2d at 535, quoting *People v Cantor*, 36 NY2d 106, 112 [1975]).  "Typically the inquiry involves a consideration of all the facts and a weighing of their individual significance" in an effort to determine what "a reasonable person would have believed, under the circumstances" (*id.*; *see Ocasio*, 85 NY2d at 984 ["whether a reasonable person would have believed, under the circumstances, that the officer's conduct was a significant limitation on (their) freedom . . . involves consideration of all the facts"]).  "These determinations can only be made on a case-by-case basis" (*Hollman*, 79 NY2d at 192; *see De Bour*, 40 NY2d at 219).

Despite our general rule mandating an examination of the totality of the circumstances in determining the reasonableness of an interaction between the police and a person, we have made one narrow exception for moving automobiles.  Thus, "as a matter of law, . . . interference with a moving vehicle is a seizure" of the vehicle's occupants requiring at least reasonable suspicion (*Ocasio*, 85 NY2d at 984; *see Hinshaw*, 35 NY3d at 430; *People v Spencer*, 84 NY2d 749, 753 [1995], *cert denied* 516 US 905 [1995]).[2] This exception accords with federal law (*see Brendlin v California*, 551 US 249, 251 [2007]; *Delaware v Prouse*, 440 US 648, 654 [1979]) and is justified because "the obvious impact of stopping the progress of an automobile is more intrusive than the minimal

---

[2] The police may also stop a moving automobile "based on probable cause that a driver has committed a traffic violation" (*Hinshaw*, 35 NY3d at 430 [internal quotation marks omitted]) or "pursuant to routine, nonpretextual traffic checks to enforce traffic regulations" (*Spencer*, 84 NY2d at 753; *see Hinshaw*, 35 NY3d at 430).

intrusion involved in stopping a pedestrian" (*Spencer*, 84 NY2d at 752 [internal quotation marks omitted]; *see Hinshaw*, 35 NY3d at 432).

Nevertheless, the automobile rule is a rarity and does not apply to parked cars or cars stopped at a stop signal (*see Ocasio*, 85 NY2d at 984-985; *Spencer*, 84 NY2d at 753). Rather, *De Bour* applies to the occupants of a parked or stationary car (*see Spencer*, 84 NY2d at 753). The majority now extends the automobile rule (which does not even apply to all cars) to bicycles.

## III.

The majority has adopted a nebulous "per se" rule that fails to make clear the scope of the new bicycle rule. The police and lower courts are left to speculate whether the rule applies to: (1) any "police interference with a bicyclist" (majority op at 2); (2) only persons cycling on a roadway and, thus, subject to the Vehicle and Traffic Law (*see id.* at 11-12), (3) only to "moving bicyclist[s]" (*id.* at 14), or (4) some other as yet undefined class of cyclists.

Contrary to the majority's holding, police encounters with bicyclists should continue to be evaluated on a case-by-case basis, measured against the well-established touchstone of reasonableness. In *De Bour*, we rejected the "all or nothing approach" that the majority adopts today for (certain) bicyclists, concluding that ignoring a case's circumstances was contrary to "[c]ommon sense and a firm grasp of the practicalities involved" (40 NY2d at 217). Rather than judicially codifying a haphazard set of per se rules in the search and seizure realm, we have, until today, adhered to our test analyzing

the "crucial factor," whether "the police behavior can be characterized as reasonable" under the facts presented (*id.*).

Of course, in certain circumstances, a police encounter with a bicyclist may rise to a seizure (*see People v Morris*, 138 AD3d 1239, 1239-1240 [3d Dept 2016], *lv denied* 27 NY3d 1153 [2016]; *People v Lee*, 96 AD3d 1522, 1525 [4th Dept 2012]).  I continue to believe that we can trust our courts to make that determination.  Notably, each Appellate Division department has applied our totality of the circumstances test to police encounters with bicyclists for decades without any confusion (*see e.g. People v Feliciano*, 140 AD3d 1776, 1776 [4th Dept 2016], *lv denied* 28 NY3d 1027 [2016]; *Morris*, 138 AD3d at 1239-1240; *Matter of Jamaal C.*, 19 AD3d 144, 145 [1st Dept 2005]; *People v Day*, 8 AD3d 495, 495-496 [2d Dept 2004], *lv denied* 3 NY3d 739 [2004]; *People v Ruffin*, 133 AD2d 425, 425, 428 [2d Dept 1987], *appeal withdrawn* 70 NY2d 877 [1987]).

Despite this common sense approach based on reasonableness, the majority effects a drastic change in our law by abandoning our well settled search and seizure precedent.  It concludes that

> "[w]hether an individual is driving a car or riding a bike, a police order to stop requires them to halt their momentum based on the expectation that any attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no bicyclist would feel free to leave in the first place" (majority op at 7 [internal quotation marks omitted]).

The majority appears to treat bicycles the same as cars because both may be in motion on the roadway.  The majority has thus started us down a slippery slope, which could eventually lead to per se rules for any number of devices that may be used to put a person

in motion, including such items as skateboards and in-line skates. If extended, the majority's analysis might lead to per se rules for people in motion, i.e., joggers and other pedestrians.

The majority attempts to limit the scope of the new rule by adding an analysis aligning its application to bicycles with the Vehicle and Traffic Law. Initially, the majority concedes, as it must, that the Vehicle and Traffic Law "does not include bicycles within its definition of 'vehicles' " (*id.* at 11, citing Vehicle and Traffic Law § 159). A bicycle is also not a "[m]otor vehicle[ ]" (Vehicle and Traffic Law § 125) and, in fact, is separately defined in Vehicle and Traffic Law § 102. It makes sense that the legislature has distinguished between cars and bicycles in the Vehicle and Traffic Law because, contrary to the majority's implication, a bicycle simply is not a car.

The majority strains to identify similarities between the Vehicle and Traffic Law's treatment of cars and bicycles, unremarkably noting that bicycles must have bells and cars must have horns and that both cyclists and motorists must signal before turning. "[M]ost significantly, bicyclists are *sometimes* restricted to riding on public roadways" (majority op at 11 [emphasis added] [internal quotation marks omitted]). It appears that this last and most significant factor only applies to some unknown class of bicyclists or some subset of roadways in the state. And while Vehicle and Traffic Law § 1231 makes traffic laws applicable to bicyclists (and persons gliding along on in-line skates), it does so to ensure the safe flow of traffic. The Vehicle and Traffic Law does not turn a bicycle into a car for search and seizure purposes.

In attempting to analogize cars and bicycles, the majority concludes that stops of both involve the same "show of governmental authority" (majority op at 7). This is rarely true. Most obviously, a vehicle ordinarily is enclosed, inhibiting the effectiveness of a verbal request, particularly if the windows are closed. It takes a significant show of authority to stop a motor vehicle, justifying a per se rule for stops of moving cars. The stop of a vehicle, a two-ton mass of steel, which may be traveling at high speeds, will almost always require officers to activate their car's lights or sirens, or block the vehicle's movement, resulting in "a possibly unsettling show of authority" and potentially creating "substantial anxiety" (*Prouse*, 440 US at 657; *see People v May*, 81 NY2d 725, 727 [1992]).

By contrast, much less is typically required to stop a bicycle. A bicycle is not capable of reaching a car's high speed. At any given moment, an untold number of cars are traveling at 65 miles per hour on the Thruway or at similarly great speeds on other highways, parkways, and thoroughfares in this state. The majority's example of a car driving at five miles per hour ignores the reality of how drivers operate the vast majority of cars in New York. The majority is willing to upend our search and seizure law by focusing on what sometimes occurs on congested city streets. While cyclists may reach speeds comparable to cars in certain situations, for the most part cars need a more significant show of force to be pulled over. Thus, a bicycle stop can more likely be effectuated by an officer making a verbal request, as was the case here.

In sum, while we have adopted a unique per se rule for stops of moving vehicles, the differences between cars and bicycles render a similar per se rule for cyclists unnecessary.

IV.

The majority's per se rule is also bad policy.  It will endanger New Yorkers by precluding police from conducting a common-law inquiry of a cyclist with a "waistband bulge," the "telltale" sign of a weapon (*De Bour*, 40 NY2d at 221; *see People v Benjamin*, 51 NY2d 267, 271 [1980]).  In *De Bour*, we said that an officer should be "expected to request clarification as to the source of [a] waistband bulge" (40 NY2d at 221).  The majority recoils from the ramifications of its holding (*see* majority op 10), but the result speaks for itself.  Now, instead of acting to rid our streets of the deadly menace presented by loaded firearms, the police will be forced to ignore a cyclist with a waistband bulge, for no reason other than that the person happened to be riding a bicycle.  In this way, the majority's rule needlessly "hamper[s] the police in the performance of their . . . vital task[ ]" of maintaining order in our communities (*DeBour*, 40 NY2d at 218).

This essential role likely will become even more important in the wake of *New York State Rifle & Pistol Assn., Inc. v Bruen*, (597 US — , 142 S Ct 2111 [2022]), given the potential for the proliferation of guns on our streets.  Therefore, it seems like an especially inopportune time for this Court to impose unwarranted barriers to policing gun crime.

Additionally, the majority's rule merely shifts the risk of arbitrary police encounters to pretextual stops.  Absent the per se rule, the *De Bour* analysis ensures that bicyclists cannot be stopped based on an officer's hunch or curiosity.  Officers must have the requisite

basis under levels one or two to request information or make a common-law inquiry. The majority has stripped these protections from bicyclists, essentially inviting police officers to engage in stops pursuant to the Vehicle and Traffic Law when, for instance, a person's bicycle lacks a bell or a reflector or the rider fails to use hand signals. Thus, police officers must now engage with bicyclists at level three or four under *De Bour*, resulting in a greater intrusion and less privacy for the cyclists.

V.

Here, applying our formerly settled *De Bour* rubric, the record demonstrates that the police had founded suspicion to conduct a common-law inquiry when they observed defendant on his bicycle holding what appeared, and turned out to be, a loaded firearm in his waistband. From now on, because of the majority's contorted reasoning, what is seen must be unseen, and the bicyclist is free to ride away, locked and loaded.

I dissent.

Order reversed, defendant's motion to suppress granted and indictment dismissed. Opinion by Judge Rivera. Chief Judge Wilson and Judges Troutman and Egan Jr. concur. Judge Singas dissents and votes to affirm in an opinion, in which Judges Garcia and Cannataro concur. Judge Halligan took no part.

Decided November 21, 2023